IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| REGINA MASON, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 3:08-CV-236-O (BH) |
| § | |
| COMMISSIONER OF SOCIAL § | |
| SECURITY ADMINISTRATION, § | |
| § | |
| Defendant. § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Motion for Summary Judgment* ("Pl. Mot."), filed September 19, 2008, and *Commissioner's Motion for Summary Judgment* ("Def. Mot."), filed October 17, 2008. Plaintiff did not file a reply. Having reviewed the evidence of the parties in connection with the pleadings, the Court recommends that the final decision of the Commissioner be **AFFIRMED**.

### I. BACKGROUND[1]

**A.    Procedural History**

Regina Mason ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Title II of the Social Security Act. On April 20, 2005, Plaintiff filed an application for disability benefits. (Tr. at

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

50-55, 65). Plaintiff claimed she had been disabled since July 13, 2004, due to problems with her left leg and neck area and ruptured discs in her back. (Tr. at 69). Plaintiff's application was denied initially and upon reconsideration. (Tr. at 23, 30). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 34). A hearing, at which Plaintiff personally appeared and testified, was held on July 10, 2007. (Tr. at 466-85). On August 16, 2007, the ALJ issued his decision finding Plaintiff not disabled. (Tr. at 10-19). The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 6-8). Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 6). Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on February 11, 2008.

**B.     Factual History**

    **1.     Age, Education, and Work Experience**

Plaintiff was born in 1964. (Tr. at 50). At the time of the hearing before the ALJ, she was 43 years old and had an eleventh grade education. (Tr. at 469). Her past relevant work experience included work as housekeeper, custodian, cashier, and home health aide. (Tr. at 483). Plaintiff last worked in July of 2004. (Tr. at 469).

    **2.     Medical Evidence**

Plaintiff's medical history dates back to 1989, when she sustained an injury to her left knee while working as a housekeeper at a nursing home. (Tr. at 159). Plaintiff received care from Dr. John McConnell, M.D., an orthopedic surgeon, and on March 9, 1990, she underwent arthroscopic surgery of the left knee. (Tr. at 160). In July of the same year, she underwent another surgical procedure which included repair of the patellar tendon with augmentation with ligament graft and

a lateral retinacular release. (Tr. at 161). Plaintiff continued to see Dr. McConnell until February of 1992. During this time, Dr. McConnell noted that Plaintiff was noncompliant with her recommended knee strengthening exercises. (Tr. at 168). He also noted that he could not justify her request for a medical statement that she could not perform her housekeeping duties. (Tr. at 170). In a review of his medical notes on July 31, 1992, Dr. McConnell noted that Plaintiff continued to experience pain in her knee and that she had achieved maximum medical recovery without further surgery. (Tr. at 174). He believed she was a candidate for arthroscopic surgery. *Id.* Despite Plaintiff's ongoing pain, Dr. McConnell believed that Plaintiff could continue to work as a housekeeper with the exception of activities that required squatting or climbing stairs. (Tr. at 174-75).

On July 13, 2004, Plaintiff slipped and fell while shopping at a grocery store and was taken to the emergency room at Presbyterian Hospital in Greenville, Texas. (Tr. at 407). Plaintiff complained of an injury to her lower left extremity. *Id.* She did not injure her head and denied neck pain. *Id.* Dr. Scott Pierce, M.D. examined Plaintiff and noted no tenderness and a normal range of motion in her neck and back. (Tr. at 407-08). Her left leg had moderate tenderness but no swelling. Dr. Pierce ordered an x-ray of Plaintiff's left leg and diagnosed her with a left proximal fibula fracture. (Tr. at 408, 410). He discharged Plaintiff in good condition with instructions to apply ice to her leg, use crutches, and avoid weight bearing activity for two weeks. (Tr. at 408).

One week after her slip-and-fall, Plaintiff began chiropractic treatments from Dr. George Elandary, D.C. at Dallas Health & Rehab. At her initial consultation on July 20, 2004, the chiropractor diagnosed Plaintiff with a fracture of the left fibula with displacement; a sprained or strained ankle, shoulder, cervical spine, and thoracic spine; pain in the arm; and muscle spasm. (Tr.

at 386). Plaintiff received treatments from this chiropractic clinic several times a month for the next six months, until January 12, 2005. (Tr. at 294-387).

On July 21, 2004, one day after Dr. Elandary's examination, Dr. Fernando Mallou, M.D. examined Plaintiff for complaints of pain in her left arm and left leg. (Tr. at 280). Dr. Mallou observed that Plaintiff had a full range of motion without pain in her cervical spine; full range of motion in the left shoulder with pain in the triceps area; pain and resisted movements in the left elbow; and full range of motion without pain in the thoracic and lumbar spine. *Id*. He diagnosed her with a left arm contusion and fibular fracture. *Id*.

Nine days later, on July 30, 2004, Plaintiff visited Dr. Warran Ross, M.D., an orthopedic surgeon in Austin, Texas, on a referral from Dr. Elandary. (Tr. at 288-90). Dr. Ross noted that Plaintiff was first referred to an orthopedist in the Dallas area who refused to treat her because she had no insurance and no funds to pay for treatment. (Tr. at 288-290). Upon examination of Plaintiff's cervical spine, Dr. Ross noted that extension and left rotation were limited at seventy-five percent, right rotation was limited at fifty percent, motion was restricted on forward flexion, and soft tissue fullness and pain on pressure were present at the left 4-5 and 5-6 articular facets. (Tr. at 288). Dr. Ross also noted painful crepitation at the left A-C joint, and that the pain increased in severity on extremes of motion of the left shoulder. (Tr. at 288-289). Upon examination of Plaintiff's lower extremities, Dr. Ross indicated that there was an ill-fitting posterior plaster splint on the left knee, pain at the upper fibula, and painful crepitation at the left fracture area. (Tr. at 289). Dr. Ross diagnosed Plaintiff with herniated discs at C4-5 and 5-6 with left neuropathy, post-traumatic instability of the cervical spinal joints, post-traumatic internal derangement at the left A-C joint, a comminuted fracture of the left proximal fibula, and a contusion of the left knee. (Tr. at 289). Dr.

Ross recommended that the ill-fitting splint be replaced, and that Plaintiff undergo a magnetic resonance imaging (MRI) scan of the cervical spine. (Tr. at 289).

Plaintiff returned to the emergency room at Presbyterian Hospital on August 1, 2004, to have her splint replaced. (Tr. at 401). On physical examination, Dr. Jeffrey Haggard, M.D. noted that Plaintiff was in no acute distress and that her extremities were atraumatic. *Id*. Dr. Haggard removed her old splint and placed her leg in a knee immobilizer. (Tr. at 402). He noted that Plaintiff's condition was good and discharged her with instructions to use crutches and wear the knee immobilizer. *Id*.

On August 16, 2004, an MRI scan of Plaintiff's lumbar spine showed exaggerated lordosis and a relatively steep angulation to the sacrum; an MRI scan of her left knee revealed a medial meniscus tear.[2] (Tr. at 272-275). On August 25, 2004, an MRI scan of Plaintiff's cervical spine showed a minimal disc protrusion at C4-5. (Tr. a 270-271).

Plaintiff returned to Dr. Ross on August 27, 2004. (Tr. at 283). Dr. Ross indicated that Plaintiff continued to experience pain and stiffness in the cervical spine with radicular symptoms into the left upper extremity and pain in the left upper fibula due to the hospital's replacement of the ill-fitting splint with a knee immobilizer. It was his opinion that the knee immobilizer was "totally ineffective" to immobilize her fractured fibula. He concluded that Plaintiff needed a new posterior plaster splint or a custom-made orthotic of a long leg brace to prevent bending of the knee, and that with continued debility of the paraspinal muscles, Plaintiff was a strong candidate for surgical intervention in the cervical spine for intervertebral disc excisions. (Tr. at 283). On September 24,

---

[2] Lordosis is the forward curvature of the lumbar and cervical regions of the spinal column. The meniscus is a crescent-shaped piece of fibrocartilage that borders and partly covers the articulating surface of the tibia and femur at the knee. Medical Encyclopedia, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Nov. 18, 2008).

2004, Dr. Ross noted that Plaintiff continued to experience pain and stiffness in the cervical spine with painful paresthesias radiating into the left upper extremity, pain in the left shoulder when using her crutches, and pain in the left knee with radicular symptoms into the left foot. (Tr. at 293). Dr. Ross concluded that because Plaintiff did not have insurance and was unable to obtain immobilization of the fibula with a molded plastic case, she would require surgical excision of the proximal fibula to prevent further injury to the nerve at this level. (Tr. at 293). Dr. Ross also indicated that Plaintiff was still a strong candidate for surgical intervention in the cervical spine. (Tr. at 293). On October 29, 2004, Dr. Ross noted that Plaintiff continued to experience pain over the left proximal fibula despite receiving a long leg brace; that she continued to experience pain and limited range of motion in her cervical spine; and that there was continued altered sensation over the left deltoid muscle area and radial portion of the left hand and forearm. (Tr. at 281). Dr. Ross recommended that Plaintiff use her crutch in her right hand to resolve the symptoms in her left shoulder, and opined that she was still a strong candidate for surgical intervention in the cervical spine if her symptoms failed to respond to non-surgical measures. (Tr. at 281).

Plaintiff saw Dr. Mallou on October 27, 2004. (Tr. at 279). He noted a limited range of motion with pain in Plaintiff's left shoulder, left knee, and cervical spine. He believed that she was a good candidate for epidural steroid injections. *Id*.

On November 18, 2004, Plaintiff began to see Dr. James Laughlin, D.O. (Tr. at 393-94). Dr. Laughlin noted that Plaintiff had been seeing Dr. Ross but that he would not see her again. (Tr. at 393). On physical examination, he found a restricted range of motion in the cervical spine, cervical trigger points, and marked limitation of motion in the left knee with a callus over the fracture site. *Id*. Dr. Laughlin diagnosed Plaintiff with a healed fracture of the left proximal fibula,

displaced cervical disc with trigger points, and cervical spondylosis (degenerative disease of the spine).  *Id*.  He prescribed aggressive rehabilitation on the knee and continuing rehabilitation on the cervical spine.  (Tr. at 394).  On December 2, 2004, Dr. Laughlin believed that Plaintiff's knee pain was predominantly due to inflammation and recommended an intra-articular injection.  (Tr. at 391).

On December 8, 2004, Plaintiff visited Dr. Mallou again.  (Tr. at 277).  On physical examination, Dr. Mallou noted that Plaintiff had a limited range of motion in the cervical spine with pain at the back of the neck.  He also noted that the left shoulder and thoracic spine had limited ranges of motion with pain in the left shoulder.  Her left knee had a limited range of motion with pain.  Dr. Mallou gave Plaintiff an anti-inflammatory injection in her left knee for pain relief.  (Tr. at 278).  Dr. Mallou noted that Plaintiff left in good condition and free of pain with no apparent side effects.  *Id*.  Plaintiff returned to Dr. Mallou a week later and received an epidural steroid injection in her cervical spine.  (Tr. at 276).

On January 12, 2005, Plaintiff switched her chiropractic care to Dr. Edward Rongers, D.C. to reduce her driving time and be closer to home.  (*See* Tr. at 295, 443).  Dr. Rongers reported that Plaintiff had pain in the shoulder, cervical spine, and thoracic spine when palpitated.  (Tr. at 443).  She also exhibited limited range of motion of the cervical spine, accompanied with pain.  Plaintiff had weakness in the neck, shoulder, and arm muscles.  She tested positive on several orthopedic tests: cervical compression, cervical destraction, left shoulder depressor, and Soto-Hall.  Dr. Rongers diagnosed her with cervical and thoracic spinal subluxation.[3]  (Tr. at 443).

Plaintiff returned to Dr. Laughlin on February 8, 2005.  (Tr. at 388).  Dr. Laughlin reviewed Plaintiff's MRIs and felt that Plaintiff was not a candidate for any kind of surgical procedure in

---

[3] Subluxation is the partial dislocation of a bone or joint.  Medical Encyclopedia, U.S. National Library of Medicine, *available at* http://www.nlm.nih.gov (last visited Nov. 18, 2008).

either her left knee or cervical spine. He also opined that since she had not exhibited any radiculopathy or facet syndrome, epidural steroid injections or a facet block would not be of any benefit. Instead, he recommended chronic pain management.

After treating Plaintiff for several months, on May 13, 2005, Dr. Rongers indicated in a letter to Plaintiff's attorney that she had reached maximum medical improvement and that she would continue to experience episodes of neck and back discomfort for an indefinite period of time. (Tr. at 440). Although Dr. Rongers only treated her neck, upper back, and arm injuries, he indicated that Plaintiff should receive rehabilitation for her left leg "if she is ever expected to be employable again." (Tr. at 441).

### 3. Hearing Testimony

A hearing was held before the ALJ on July 10, 2007. (Tr. at 466-85). Plaintiff appeared personally and was represented by an attorney.

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was 43 years old and that she had an eleventh grade education. (Tr. at 469). She stopped working in July of 2004 as a custodian because she intended to open a beauty supply business. (Tr. at 469-70). She never opened the business, however, because she sustained injuries to her back and leg after a slip-and-fall accident in July of 2004. (Tr. at 470-71).

Plaintiff testified that she stays at home during the day. (Tr. at 471). She testified that although she can perform household chores, it takes her time to complete them because of pain in her back and left leg. *Id.* She testified that the pain in her upper back travels into her arms, especially her left arm. *Id.* Plaintiff is right handed. *Id.* She stated that she participated in physical therapy but that she was not under the care of any doctor. (Tr. at 472). She takes Advil for her pain.

*Id*. Plaintiff also testified that she is unable to drive a car, exercise, grocery shop, and that she needs assistance with personal hygiene and getting dressed. (Tr. at 472-473, 479). She stated that she has a poor appetite and has lost forty pounds in the last year. (Tr. at 473). She does not sleep well at night due to the pain, and must alternate positions between sitting and standing. (Tr. at 473, 479). Plaintiff further testified that she can only raise her arms to a certain point, and cannot lift more than two pounds, move her head from side to side without pain, climb stairs, squat, stand for long periods of time, or walk without pain. (Tr. at 474, 479-480). Plaintiff stated that because she experiences swelling in her knee and lower leg area, she must prop her leg up on pillows to waist level for two to three hours at a time. (Tr. at 476-477). Plaintiff indicated that the reason she stopped treatment was because she could no longer afford treatment and did not have insurance. (Tr. at 481).

### b. *Vocational Expert's Testimony*

A vocational expert ("VE") also testified at the hearing. The VE classified Plaintiff's past work as a cashier (light, unskilled, SVP 2), housekeeper (light, unskilled, SVP 2), custodian (medium, semi-skilled, SVP 3), and home health worker (medium, semi-skilled, SVP 3). (Tr. at 483). The ALJ asked the VE to assume a hypothetical individual with Plaintiff's background and a residual functional capacity ("RFC") for sedentary work restricted to no overhead reaching. *Id*. The VE testified that such an individual would not be able to perform Plaintiff's past relevant work and had no transferrable skills. *Id*.

The ALJ then asked the VE what sedentary, unskilled jobs existed that did not require any overhead reaching. *Id*. The VE testified that the following positions fit this description: food order clerk (SVP 2, with 1,200 jobs in Texas and 17,000 in the nation), assembler (SVP 2, with 5,000 jobs in Texas and 50,000 in the nation), and small part inspector (3,400 jobs in Texas and 40,000 in the

nation). (Tr. at 483-84). In response to a question by Plaintiff's attorney, the VE testified that the food order clerk position would allow someone to prop their leg up intermittently to prevent swelling. (Tr. at 484).

## C.  ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion issued on August 16, 2007. (Tr. at 10-19). The ALJ found that Plaintiff was insured for disability insurance benefits under Title II through at least June 30, 2007. (Tr. at 18, ¶1). The ALJ also found that Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability, July 13, 2004. (Tr. at 14; 18, ¶2). In addition, he found that Plaintiff had the following severe impairments: a history of surgery to the left knee,[4] a history of left proximal fibula fracture, C4-5 disc bulge, and spondylosis. The ALJ found, however, that none of these severe impairments met or equaled a listed impairment. (Tr. at 14; 18, ¶3). The ALJ also found that Plaintiff's testimony concerning her impairments and their impact on her ability to work were not substantiated by the objective medical evidence. (Tr. at 17; 18, ¶4).

The ALJ found that Plaintiff retained the RFC to perform the exertional requirements of sedentary work with no overhead reaching. (Tr. at 17; 18, ¶5). Although Plaintiff was unable to perform her past relevant work as a cashier, housekeeper, custodian, or home health aide, she could perform other work existing in significant numbers in the state and national economies. (Tr. at 18, ¶6; 19, ¶11). Such work included employment as a food order clerk, an assembler, and a small parts inspector. (Tr. at 19, ¶11). The ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time through the date of his decision. (Tr. at 19, ¶12).

---

[4] The ALJ incorrectly noted that Plaintiff had arthroscopic surgery on her right knee in March of 1990. (Tr. at 14; 18 at ¶3). The medical record shows that this surgery was on the left knee. (Tr. at 160, 225).

## II. ANALYSIS

**A.     Legal Standards**

    **1.     Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*.

## 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies

his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.    Issues for Review**

Plaintiff presents the following issues for review:

(1)    The ALJ improperly evaluated Plaintiff's credibility;

(2)    The ALJ improperly determined Plaintiff's residual functional capacity; and

(3)    The ALJ erred in finding that a significant number of jobs existed in the national economy that Plaintiff could perform.

(Pl. Br. at 1).

**C.    Issue One: Credibility**

Plaintiff first contends that the ALJ did not properly evaluate her credibility and that the record does not support his credibility determination. (Pl. Br. at 7).

Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 164 n.18 (5th Cir. 1994). Nevertheless, the ALJ's "determination or decision [regarding credibility] must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any

subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).

Plaintiff first argues that the ALJ undervalued the degree to which the objective medical evidence supported her complaints of severe pain and limitations. (Pl. Br. at 7-9). Subjective complaints must be corroborated at least in part by objective medical testimony. *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989) (citing *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988)). Plaintiff cites to medical evidence from Dr. Ross and Dr. Rongers that lends support to Plaintiff's subjective complaints of pain and limitations. In his written decision, the ALJ explicitly considered these medical records. (*See* Tr. at 14-16). He also considered the other medical evidence in the record, such as the reports by Drs. Haggard, Mallou, and Laughlin. *See id.* The records from these doctors do not support Plaintiff's allegation of disability. For example, after replacing Plaintiff's leg splint with a knee immobilizer, Dr. Haggard noted that her condition was "good." (Tr. at 402). Dr. Mallou administered epidural steroid injections to treat Plaintiff's pain and limited range of motion and obtained good results with no apparent side effects. (Tr. at 278-79). Although Dr. Laughlin found marked limitation in Plaintiff's left knee and a restricted range of motion in her cervical spine, he recommended aggressive rehabilitation and chronic pain management rather than any surgical procedure. (Tr. at 388, 394). While the findings of these doctors may conflict with those from Drs. Ross and Rongers, it is the ALJ who resolves evidentiary conflicts, not the Court. *Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985) ("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record."). In effect, by asserting that the ALJ undervalued certain medical records in relation to others, Plaintiff requests the Court to reweigh the evidence and substitute its own

judgment for that of the ALJ in an area in which he is entitled great deference.[5]  This is not permitted under the standard of review.  *Greenspan*, 38 F.3d at 236.

The second argument raised by Plaintiff with regards to credibility is that the ALJ failed to consider Plaintiff's inability to afford treatment.  (Pl. Br. at 9-10).  If a "claimant cannot afford prescribed treatment or medicine, and can find no way to obtain it, 'the condition that is disabling in fact continues to be disabling in law.'" *Lovelace*, 813 F.2d at 59 (5th Cir. 1987) (citing *Taylor v. Bowen*, 782 F.2d 1294, 1298 (5th Cir. 1986)).  An ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide...For example...The individual may be unable to afford treatment and may not have access to free or low-cost medical services."  SSR 96-7p, 1996 WL 374186, at *7-8.  Plaintiff contends that the record shows she was unable to afford treatment.  Specifically, she cites to her testimony at the administrative hearing about her lack of insurance, a second-hand refusal by a local orthopedist to treat her due to lack of funds, and a notation by Dr. Ross that she could not afford surgery.  (Pl. Br. at 9-10) (citing Tr. at 288-90, 293, 481).  According to the relevant case law and regulations, however, an inability to afford treatment by itself is insufficient; a claimant must also show that she could not obtain medical treatment from other sources, such as free or low-cost health clinics. *Lovelace*, 813 F.2d at 59 (condition disabling in law if a "claimant cannot afford prescribed treatment or medicine, *and* can find no way to obtain it") (emphasis added); SSR 96-7p, 1996 WL

---

[5] Plaintiff refers in passing to Dr. Rongers' statement that Plaintiff should receive rehabilitation for her left leg "if she is ever expected to be employable again."  (Pl. Br. at 9) (citing Tr. at 441).  This is a legal, not a medical, opinion and does not support a finding of disability.  20 C.F.R. 404.1527(e).  The Court notes that Dr. Rongers only treated Plaintiff for injuries to her neck, upper back, and arm; he did not treat her for injuries she sustained to her left leg in her 2004 slip-and-fall.  (Tr. at 441).

374186, at *8 (statements may be credible if a claimant cannot afford treatment *and* does not have access to free or low-cost medical services). None of the cited incidents provide evidence that Plaintiff sought out free or low-cost treatment. Because Plaintiff has not shown that she did not have access to free or low-cost medical services, the requirement that the ALJ consider Plaintiff's inability to pay for medical treatment does not apply. *See id*.

Finally, Plaintiff contends that the ALJ failed to consider the effects of pain on her daily activities. (Pl. Br. at 10-11). This assertion is inaccurate. The ALJ explicitly considered Plaintiff's testimony and reports of her daily activities in the body of his written decision. (Tr. at 17). He also explicitly addressed Plaintiff's allegations of disabling pain when he "recognize[d] that the claimant may experience some degree of pain or discomfort at times of overexertion. However, even moderate levels of pain are not, in and of itself [sic], incompatible with the performance of certain levels of sustained work activity." *Id*. This final argument is therefore without merit.

In sum, the ALJ properly considered the evidence in the record and applied the proper legal standards when he assessed Plaintiff's credibility. The Court therefore finds that substantial evidence supports the ALJ's credibility assessment. *Greenspan*, 38 F.3d at 236.

### D. <u>Issue Two: Residual Functional Capacity</u>

Plaintiff's second issue for review is that the ALJ improperly determined her RFC. (Pl. Br. at 11-12).

Social Security regulations provide for the ALJ to assess a claimant's RFC before proceeding from step three to step four of the sequential analysis that determines whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). When assessing a claimant's physical abilities, the ALJ first assesses the nature and extent of the physical limitations and then determines the RFC. 20 C.F.R. §

404.1545(b). "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." *Id*. "RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting." *Id*. at *2 (emphasis in the original). The RFC is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work." *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988).

In this case, the ALJ found that Plaintiff retained the RFC to perform the exertional requirements of sedentary work with no overhead reaching. (Tr. at 17; 18, ¶5). In support of this finding, he considered the medical evidence in the record as well as Plaintiff's subjective allegations. (Tr. at 16-17). Plaintiff contends that her testimony provided evidence of a more limited RFC. The ALJ noted, however, that her testimony was inconsistent with the medical record and that Plaintiff had not received medical treatment for her subjective complaints since March of 2005, more than two years before the date of the administrative hearing. (Tr. at 17). The ALJ also noted that Dr. Laughlin did not find any evidence of additional damage to Plaintiff's left knee or the need for surgical intervention in either her knee or cervical spine. *Id*. (citing Tr. at 388).

Based on the ALJ's discussion of his RFC findings, the Court finds that he properly considered the evidence in the record and applied the proper legal standards. The Court therefore

finds that substantial evidence supports the ALJ's RFC determination. *Greenspan*, 38 F.3d at 236.

E. **Issue Three: Significant Number of Jobs**

Plaintiff's final issue for review is that the ALJ erred in his step 5 finding that Plaintiff could perform a significant number of jobs in the national economy. (Pl. Br. at 13).

To establish that work exists for a claimant at steps 4 and 5 of the sequential disability determination process, the ALJ relies on the medical-vocational guidelines or the testimony of a VE in response to a hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Id*. at 436. A claimant's failure to point out deficiencies in a hypothetical question does not "automatically salvage that hypothetical as a proper basis for a determination of non-disability." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). If the ALJ relied on testimony elicited by a defective hypothetical question in making a disability determination, the ALJ did not carry his burden of proof to show that a claimant could perform available work despite an impairment. *Id*. at 708.

In this case, the ALJ asked the VE whether a hypothetical person with Plaintiff's RFC could perform other work. (Tr. at 483). The VE testified that such a person could perform sedentary, unskilled jobs as a food order clerk, assembler, and small part inspector. Each of these positions existed in significant numbers in both the national and state economy. (Tr. at 483-84). Based on this testimony, the ALJ found that Plaintiff could perform other work. (Tr. at 18; 19, ¶11). Plaintiff contends that the ALJ failed to ask the VE about her need to alternate positions between sitting and standing at will, prop her left leg up for two to three hours at a time, her inability to carry anything

heavier than two pounds, and her inability to sit for long periods of time. (Pl. Br. at 13). The ALJ, however, did not find that the objective medical evidence supported these alleged limitations. (Tr. at 18; *see* Part II.C and II.D, *supra*). Since the ALJ's hypothetical question incorporated the limitations supported by the objective medical evidence, the ALJ properly relied on the VE's response to find that Plaintiff could perform other work. *Bowling*, 36 F.3d at 436; *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988) (finding substantial evidence to support the step 5 decision because the hypothetical reasonably incorporated the disabilities recognized by the ALJ).

Accordingly, the Court finds that the ALJ met his burden at step five to show that Plaintiff could perform other work. *Greenspan*, 38 F.3d at 236; *Fraga*, 810 F.2d at 1304. Substantial evidence therefore supports the ALJ determination that Plaintiff was not under a disability as defined by the Social Security Act. *Greenspan*, 38 F.3d at 236.

### III. RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED**.

**SO RECOMMENDED** on this 20th day of November, 2008.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

      Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within ten (10) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE